The County's Women Work the Weekend policy violates Title VII and the Texas Employment Discrimination Act because intentional differential treatment in a term, condition, or privilege of employment is prohibited. A term, condition, or privilege of employment is a workplace requirement or benefit that an employer imposes on, grants to, or withholds from an employee. So, as the Sixth Circuit puts it, how could the when of employment not be a term of employment? Indeed, the when, where, and what of one's job are terms or conditions of that job. When the County implemented its expressly sex-based scheduling policy banning women from taking consecutive weekend days off, plaintiffs could not have taken full weekends of leave, precisely because contrary terms were imposed by their employers. I welcome the Court's questions, and in discussing the mismatch between the ultimate employment decision rule and Title VII's text and purpose, I'd like to start with the recent precedent in the Sixth and the D.C. Circuits, which recognize that there is no sound basis for In three, the City of Cleveland instituted a race-based shift assignment policy that preempted a seniority-based assignment policy. The Sixth Circuit explained that there was little room for debate that the City discriminated against the plaintiffs, that is, that it treated them differently because of race, and that the discrimination impacted the terms, conditions, or privileges of the plaintiff's employment because, quote, a shift schedule is a term of employment, end quote. And the benefits that come with seniority count as privileges of employment. Likewise, in the D.C. Circuit, once it has been established that an employer has discriminated against an employee with respect to that employee's terms, conditions, or privileges of employment, because of a protective characteristic, the analysis is complete because the plain text of Title VII requires no more. Title VII's unadorned wording admits of no distinction between economic and non-economic discrimination or tangible and intangible discrimination, nor does it distinguish between subtle or overt discrimination or include an objective reasonable employee standard. The en banc D.C. Circuit emphasized in chambers that its prior precedent, which was akin to this Court's ultimate employment decision rule, and required plaintiffs to prove that they had suffered objectively tangible harm caused irreconcilable results because rules based on materiality, significance, or objectively tangible harm are so amorphous as to accommodate inconsistent outcomes in like cases and leave courts adrift with line-drawing exercises unworn from the statutory text. And that's borne out in the decisions of this Court applying the ultimate employment decision rule. Consider the inconsistency between Forsys v. City of Dallas County and Benningfield v. City of Houston as an example. In Forsys, the Court decided that the plaintiff had suffered no so-called adverse employment action or ultimate employment decision because it concluded, or excuse me, in Forsys, the Court concluded that the plaintiff had suffered a so-called adverse employment action because it concluded that they were denied a more prestigious opportunity that had better working hours. In Benningfield, though, the Court held that a plaintiff who was assigned a night shift given an unusually heavy workload, denied overtime and travel reimburses owed to her, prevented from attending certain conferences, and had a promotion delayed for two years, had not suffered any adverse employment action or ultimate employment decision. And the irreconcilable results cannot be rationalized by factual differences, and they show that the Court's current standard is unworkable. There are limitations that exist at every stage of the litigation to help keep the flood gates closed, existing limitations that mean that this Court should not distort the meaning of Title VII's text. And those include, for example, that we're here talking today about liability. We're not focused on whether the plaintiff may be able to recover significant damages, and if a plaintiff is unable to recover significant damages because, unlike in the circumstance here where we have a significant harm that my clients have suffered, in a case that's more marginal and less in the heartland of what Title VII was designed to protect against, it might be a situation where the plaintiff is unlikely to recover significant damages. In that case, even if the conduct is actionable under Title VII, because it's discrimination, because of a protected characteristic that's with respect to a term condition or privilege of employment, the plaintiff may not decide to pursue a lawsuit, and they may find it quite difficult to find an attorney who would bring that suit. We also have the limitations, like the plausibility standards required by Twombly and Iqbal, that it may be quite difficult to allege facts that make it plausible that the employer was in fact engaging in discriminatory intent. This is, of course, the unusual case where the plaintiffs have alleged facts that require no inference to show that the county here discriminated against them. And that's because, as we know, the county here, according to the allegations, told the plaintiffs that they were unable to take weekends off because they're women and that this policy is based on gender, and that's at ROA 14 and Record Excerpt 23. So, of course, at the stage of proving discriminatory intent, in a typical case, it's going to be quite difficult to prove discriminatory intent, and that's going to be another limitation. It may be quite difficult to prove discriminatory intent because, again, the plaintiff is unlikely to have that direct evidence, that memo in the file that says the employer's conduct is based on discrimination, and instead, the employee may have to proceed through the McDonnell Douglas standards and use comparator evidence that meets certain thresholds. There's also the limitation of the fact that an employee will have to demonstrate that  So, for example, if a supervisor smiles at employees of one face and uses a neutral expression with employees of another face, that's unlikely to be imputed to the employer. And so there's no risk that the rule that we advocate for here today, and that's supported by Supreme Court precedent, Title VII's text and purpose, will open floodgates or will lead to becoming a civility code in the workplace because of the limitation that the conduct must be a term condition or privilege of employment that's limited to the workplace. So, another example, if a supervisor doesn't invite an employee to a Fourth of July party, that's not, that is indisputably not a work event, even if that act is discriminatory, it will not be actionable because it's not a term condition or privilege of employment. And I point the court to the labor law origins of the phrase term conditions or privileges of employment because they underscore the conclusion that a shift assignment is a term of employment because the NLRA's use of terms and conditions of employment have been understood as capacious, including all attributes of an employer-employee relationship. And that principle is illustrated by this court's decision in more business forms where there was no doubt that assigning returning strikers to a particular shift operated to discriminate between strikers and non-strikers in a term of employment under the NLRA Section 8A3. And the Supreme Court, too, has said, and I'm quoting Jewel Tea Company, that the particular hours of the day and the particular days of the week during which employees shall be required to work are subjects well within the realm of terms and conditions of employment. The 1991 Civil Rights Act provides additional factual support for our position. In particular, Congress's decision to add a remedy for non-pay-related injuries, including teen suffering, mental anguish, and other non-continuary losses, indicates that the act was meant to remedy all discriminatory misconduct, not just monetizable harms, as this court's ultimate employment decision precedent suggests and as the county advocates. I'd also like to remind the court of some applications of the ultimate employment decision rule beyond the facts at issue in this case. For example, I point the court to this court's decision in Peterson where a Black employee was required to work outside in the Louisiana heat while White employees worked the same job indoors in air conditioning with water. Miss, are you open for questions now? Absolutely, Your Honor. I'm just wondering at the unusual silence of my colleagues. What do you advocate as the standard? We'd have to get around to that. The standard is that any differential treatment that's because of a protected characteristic and that is with respect to a term condition or privilege of employment is prohibited, and a term condition or privilege of employment is a workplace requirement or benefit that an employer imposes on, grants to, or withholds from an employer. So basically, you're smuggling the word material into the interpretation of term, condition, or privilege. Is that not fair to say? I'm not sure. Is the question whether there's a materiality standard? Yes, indeed. I don't think that we advocate that there's a materiality standard based into the phrase terms, conditions, or privileges of employment. Instead... Well, how do you differentiate the boss who doesn't take a particular person to lunch because, let's say, he doesn't like their sense of humor or something, on the one hand, which is differential treatment, and anyone can say it's because of a protected class, from something more tangible? So I think the distinction is whether that is discrimination that's because of a protected characteristic. And so I don't think it's quite right. But you can't decide that. There's no way to eliminate that claim at an early stage, right? I think there is a way to eliminate that claim at an early stage if it doesn't meet the Twombly or Iqbal plausibility standards. If it's bare bones allegations... So, all right. So plaintiff... We get a lot of pro se cases. We also get a lot of cases that are motivated by the prospect of shifting attorney's fees. And as you know, the cost of Title VII litigation now routinely goes into double six figures on the defendant's side, certainly. So these are not small matters. And a pro se person can easily file a case that says, my boss didn't take me to lunch when he took the other people to lunch, and he's discriminating against me because of my race, class, sex, and gender. Sorry, Your Honor. To the extent that those allegations would get past Twombly and Iqbal's plausibility scale... No, he didn't take me on September 20th. So I'd start by... I'll start by explaining why, in our view, no de minimis standard can be read into Section 703A1. But then I do want to talk about the approaches taken by the D.C. Circuit and the Sixth Circuit in Chambers and Three, because those present alternative paths to what our principled position is. And so in reminding the court that the law does not take account of trifles, the county has ignored that a de minimis exception cannot stand if it is contrary to the express terms of the statute. Do you think taking someone to lunch and not others is a term or condition of employment? Yes. We believe that is a term, condition, or privilege of employment. And that would seem to most obviously fall into the ordinary meaning of privilege of employment, but of course... So I'm pretty sure I've read somewhere that Vice President Pence had a practice, for his personal reasons, not taking women to lunch. Let's stipulate that there is zero discrimination in that office, but because of his Christian values and fidelity to his wife, he just doesn't want to be one-on-one with one of his female employees. That would be actionable? That would be actionable because that would be differential treatment. That's because of a protected characteristic, in that case, sex, and it would be based on a term, condition, or privilege of employment. So even if all the women in the office stipulate that the treatment in the office is completely fair, all of the opportunities to rise, to do well, to be promoted, to be paid well, all are completely equal. He just has this personal reason that he uses his free lunchtime differently. And of course, there are many people who have these views in the workplace today. So under your hypothetical, where the women in the office are making that stipulation, then it sounds like... Except for this, but this is the one thing that's different. In that office space, the... Obviously, I'm just probing this sort of even lunch, even though that has no effect on, I'll just use your terms, any other term or condition. You're saying lunch itself is a term or condition. Yes. Then what isn't a term or condition? It sounds like everything is. So no, again, I point you to the examples that I referenced earlier of something that might take place outside the workplace. Yeah, but the problem with your examples is that it's all in the eye of the beholder. I mean, you said something about if it's clearly not a 4th of July picnic related to work, when is it ever clear? When a plaintiff says, I allege this, you're saying all those things. I don't really see Iqbal or Twombly stopping any of those cases. I don't really see any of the other limitations you talk about as being an effective guardrail at all. So unless we have a materiality standard or a de minimis standard, which kind of the flip side of the same coin, how do we keep the floodgates closed? You're saying open them up. So Your Honor, again, our principle position is that the text of Title VII is capacious, and so it is not the task of a court. Perhaps you need to pivot to your second argument that you said you were going to pivot to, that most all the other circuits would not allow that lunch claim, and perhaps you need to explain why, and that might be helpful. I think you can win without going this far. I think you can win your case without going this far. I think that's right, Your Honor. It's clean that the conduct at issue here is more than de minimis, and so I turn the court's attention to how the D.C. Circuit and the 6th Circuit approached this issue. So in Chambers, for example, the D.C. Circuit decided that it wasn't the appropriate occasion to determine whether a de minimis exception could be read into Section 703. But Chief Judge Sutton explained that whether more than de minimis or materiality, it's all the same thing, and that that is read into it. That materiality or more than de minimis is part of it. Why isn't that the approach that we should take? So that is certainly an approach that is available to this Court, and if the Court chooses to take the approach that Chief Judge Sutton took in the Threat case, what we would this Court explain, just as Chief Judge Sutton did, that de minimis means de minimis, and that means that, in fact, taking someone to lunch is essentially non-de minimis when it is based on discrimination. Let me give you another example that hits somewhat close to home. Suppose you're in a workplace in a law firm that has 10 associates, and you only have five offices that have windows. Are the other five associates, let's say they are different nationality or religion or something, every one of them, except the white males, can probably say he or she is discriminated against because he doesn't have a window which lets in natural light, which is better for one's eyesight over the long haul than halogen or fluorescent light bulbs and so on and so forth. Is that an actionable claim? So I think that depends on whether this Court reads the de minimis exception into Section 703A1 or not, but to start, it's our view that whether the de minimis exception can be read in, discrimination itself that's because of a protected characteristic is always going to clear that bar. Allegations are cheap, okay, and they allege that the only reason that the employer discriminated against the five of us because we are Asian, we are male, and we are of a certain religion, and leave aside the fact that they may have only been on board six months and the other people may have been on board three years. They can allege whatever they want, and according to you, there's no de minimis when they get to the jury. So I don't think that those allegations would get past a Twombly and Iqbal standard, but to the extent that they would, and to the extent that this Court disagrees with our view that discrimination that's based on a protected characteristic is always non-trivial, I'd posit an example that is in the shift assignment space because that's what we're here focused on today. So imagine instead of this across-the-board sex-based policy that told women they couldn't take weekends off, an individual female employee requests a 9-to-5 shift and she's given a 930-to-530 shift and a male officer is given the 9-to-5 shift. Now if this Court adopts a de minimis exception, perhaps that would be viewed as a de minimis change in a term, condition, or privilege of employment. But what that means is that if a memo in the file shows that the reason that the woman was denied the 930-to-530 shift is that the boss thinks that women should drop their children off at school. And so we have this plain discrimination that is because of sex and in our view is non-trivial, but under this Court, if this Court were to read a de minimis exception into Section 703A1, it would be required to hold that that change would be non-de minimis. And I'd again point the Court to your time. Yes, and I will be back on rebuttal. Thank you so much. Good morning and may it please the Court, Anna Baldwin for the United States as amicus. The question presented in this appeal is whether Title VII freely permits employers to require women because they are women to work weekends while allowing men because they are men to have those preferred weekend shifts off. The answer under the plain text of Title VII is clearly no. However, as this Court is well aware, the answer under this Court's precedence and its ultimate employment decision rule is unfortunately yes. That answer is incorrect and this case presents this Court an opportunity to return to the statute's plain text. In the questions that this Court has been asking counsel before, it's clear that this case as a case is not a difficult one. Again, this is about a shift assignment in the heartland of the statute, the heartland of what constitutes a term, condition, or privilege of employment. In deciding this case, the Court can simply decide this case and not issue a compliance manual. It would be a significant, you know, improvement in the clarity of the law and return to the text of the statute simply to that something like a shift assignment is actionable. And in doing so, the Court doesn't necessarily have to reach some of the more difficult or marginal questions that are involved at the sort of outside scope. But to get to the Court's question about sort of is there a materiality requirement or do you need to have a de minimis requirement, the United States position is no. The claim that Congress wrote has three elements, and that is differential treatment, discrimination that injures on the basis of a protected characteristic in the terms, conditions, and privileges of employment. And what counsel's term, conditions, or privilege of employment is objective. And, you know, we agree with the plaintiff's counsel as to the definition that it's something that an employer acting in the capacity as an employer imposes on grants to or requires. But I think we would have a little bit of a different answer with regard to just the bare example of is going to lunch a term, condition, or privilege of employment. That's not clear that that's something that an employer is doing in the capacity of an employer if it's just sort of ordinary social interaction that occurs in the workplace. Title VII isn't meant to police all those sorts of ordinary interactions. Now, if it's a training lunch that is, say, a law firm is having a lunch to do CLEs and you have a policy that says we're only going to invite women but not men to this CLE lunch, that's, of course, actionable. And that's, of course, a term, condition, or privilege of employment. And so just because they're line-drawing questions, it doesn't mean that, you know, the court need, you know, apply some sort of extra textual rules of deciding what a term, condition, or privilege of employment is. It's going to be the work of, you know, judges in looking at the allegations of a complaint. It's going to be the work of summary judgment in making sure that there's sufficient facts that say that these plausibly are terms that are actually attributable to the employer in the sort of normal agency relationship where you look at what is an employer actually responsible for and what is just normal social interaction. At this point, I recognize I have a few more minutes of uninterrupted time, but if the court, I'm glad to continue, and I'm also happy to take questions at this point. I was curious. I think you said, I want to clarify what you said, a women-only lunch might be actionable, might not, depending on what. I just want to make sure I heard it. Yes, so I think, you know, again, we have to look at, it matters, the Supreme Court has said time and time again in Title VII, context matters. They said that in on-call, they said that in white, and so, again, the court doesn't have to issue a decision, well, if you do these actions, you know, these are definitely terms, conditions, or privileges. The context is going to make clear whether that is actually something that is attributable to the employer, and Judge Ho, as you mentioned, there could be different rules for when, just given the social meaning of sex, when an employer taking account of, in some instance, the fact that they have men and women employees, the social meaning of sex and social distinctions based on sex have different legal meanings than, for example, the same thing. Well, let's, I don't want to spiral out of control here. Let's get back to the lunch thing. I really just want to make sure I understood your earlier point. I think you were saying that a lunch could be purely social. It could be more functionally employment. I think you mentioned training sessions. Sure. Yes, Your Honor. So, I think... I'm just amused because I think a lot of the nation's law firms are violating that rule. I don't have a problem with holding them accountable, by the way, but... So, again, if it's a training lunch, if it's work-related, if it's about giving, you know, work assignments, if you... A lot of law firms do that. Sure, and if that's sex-based... Look forward to those lawsuits. And that looks awfully a lot like conditions of employment. If it's purely social, you know, are you... Is a person necessarily a good person if they're only socializing with their colleagues and building those relationships? That's not necessarily... So, what you're asking is every employer in the United States, in a Dilbert-like office, as opposed to, let's say, the McDonald's or the manufacturing line, every employer, it's sort of like the consent-to-sex deal. We are going to lunch today on a purely social event, period. We are going to lunch today on an event where we may discuss aspects of the workplace. Do you know anybody who goes to lunch with co-workers who does not discuss things about the workplace? I do, Your Honor, and I... Yes or no? I mean, that's human nature because that is how you are... That's the basis of your interaction with those people. Sure, Your Honor, and I don't want to suggest that it's just talking about the workplace that's going to determine it onto the... Whether this is more like a term or condition of, you know, employment. I think it's going to... The specifics of the allegations of what you've been excluded from are going to matter, and will that be a line-drawing exercise? It will, but the problem right now is the line-drawing exercise has veered so far from the text of the statute that you can literally have work assignments like in Peterson happening on the basis of race, and that's not accurate. You said earlier that you didn't think that we should state what our test is and we should just decide this case. Well, we're all here, and we've been studying this quite a bit, and I think that you... You started out by saying we should get rid of that test that's been around for 25 years. It's out of sorts, but now you're telling us we shouldn't have a test, and I'm wondering if you think every... Does the United States think that every circuit's test is not consistent with the law except for the D.C. Third circuit says serious and tangible. Fourth circuit says significant and detrimental. Sixth circuit says de minimis. Seventh says material adverse. Eighth says material changed. Ninth says material effects, and I could go on, but you get the point. Are you saying every circuit except the additional requirement to show material harm in the term, condition, or privilege of employment, and I think there's a lot of variety in how the circuits actually apply those tests, but where the harm requirement comes is from being subjected to intentional discrimination itself. The statute doesn't have a requirement that you show I was discriminated against on the basis of privileges. I just want to say briefly about the Supreme Court's decision in White where a lot of the materiality requirement comes from. First, the Supreme Court made clear that it was not interpreting the retaliation provision in 703 as determinants. Also, the materiality requirement there is really functioning as an objectivity requirement. Is this materially adverse in the retaliation to life? It's not saying is it sufficiently harmful. The harm, again, comes from- Well, let me ask you a question about the court's sex harassment jurisprudence because I think, well, I know our circuit, and I think the Supreme Court as well, have applied an objective, severe, and pervasive misconduct as a base for a harassment claim. So you're saying that a harassment claim? No, Your Honor. I agree that the discrimination claim Congress has given what the objective harm is, and the objective harm is being subjected- But harassment, sex harassment didn't exist within Title VII until the Supreme Court created that, adopted that as an interpretation, and said it requires objectively severe and pervasive misconduct. Your Honor- Not the ordinary given cake between males and females is in the workplace. If I could, Your Honor, I see my time, but I'd be glad to answer the question. So what the Supreme Court, how we understand that is the Supreme Court was simply applying to the sexual harassment context the statutory language about terms and conditions to say, when does harassment become severe or pervasive enough that it's altering your conditions of employment? So let's say you have- Terms, conditions, or privileges, that is to say. Yes, Your Honor, so- Right, of course. So for example, you have, you know, a supervisor who placed their hand on somebody's shoulder on a one-time basis. That may be sex-based, but just that one time, does it necessarily- It's not actionable, it's not severe or pervasive, and the way we understand that with the terms, conditions, or privileges is it's not until it becomes so severe, so pervasive, that it happens every day, that you're expected to just come and be manhandled at work, that that becomes a term or condition of employment, that you as an employee are being expected to submit to that conduct. So in that sense, we understand our argument is perfectly consistent with the Supreme Court's, you know, sexual harassment jurisdiction. Counsel, counsel, sorry, over here. I know you're out of time, but I want to ask you anyway. I want to hear, is it the United States' view that the words compensation, terms, conditions, privileges limit the reach of the statute? Meaning that there are things that might happen in the workplace that may well be seen as discriminatory, even harmful, but aren't compensation, terms, conditions, or privileges? Yes, Your Honor. And I think in the sort of sexual or racial harassment context, that's clear that there can be, you know, incidents that happen in the workplace that are animus-based, but they're not necessarily attributable to the employer, right? Well, that's different. I mean, well, I'm not, well, maybe it's different or not, whether it's attributable to the employer. We have to come up with a definition of conditions or terms, for example, that delimit the statute. So the way that we understand terms, conditions, and privileges is, you know, looking at, for example, in White, the Court said that retaliation and the substantive discrimination provisions are different because the retaliation provision isn't limited to the workplace. So, you know, the discrimination provision is, and it's all attributes or incidents of the employer-employee relationship. And so the Supreme Court has said that terms, conditions, and privileges is broad. We don't, you know, understand there to be specific meanings to what the term, what the condition, what the privilege, but that it's more just meant to cover the waterfront of all the sort of conditions and in the official capacity that is attributable to the employer, quads and employer, and not just as, you know, we're also social creatures in the workplace, that that would be something that comes within the scope of the statute. So is it broad? Yes, and it's broad by design. Counsel, we're aware of the Eighth Circuit case, Muldrow, and we know that the Supreme Court has that case I think was a job transfer or whatever. I'm not, don't remember off the top of my head what the third question, but my question to you is, has the Department weighed in yet vis-a-vis the Title VII interpretation in this case? And if so, to what extent is that germane or not to the issue before us? The United States hasn't, the Solicitor General's Office hasn't, you know, issued a position as to whether the court, you know, should take those particular cases. Of course, you know, any, you know, representations here in our briefs are consistent with the positions that the Solicitor General has, you know, generally authorized the United States to make. So as to how this case may interact with, you know, Muldrow or Davis, if the Supreme Court were to ultimately take those, you know, it's the United States position that this court doesn't need to necessarily wait to see that it's, you know, there are Title VII cases being litigated day in and day out. Well, that's not really what I was trying to get you to peep the hand. I was just trying to figure out if your lead-in position, the court can just decide this case, period. I mean, if that's the sort of position taken as opposed to this, the broader questions that we have. So if you've answered it, that's fine. Yes, Your Honor. I mean, as to the position of the Solicitor General's office in a similar sort of lateral transfer case, I would point the court to the Solicitor General's brief in August, which was a lateral transfer case, and of course, this court's case, Peterson, about work assignments in which the court opined on the ultimate, where the S.G. opined on the ultimate employment situation. Okay. Thank you. Thank you, Your Honor. We'd ask the court to reject the rule and reverse the decision here. Would you please add four minutes to the Good morning. May it please the court. My name is Jason Chouette. I'm an Assistant District Attorney. I represent the appellee, Dallas County, Texas, in this case. I think that I would start by pointing out that the United States is correct. The court can simply resolve this case by deciding the issue in front of it. This court can simply, as the Sixth Circuit did in Freed, decide that a limited ruling that simply says, as in our case, that a shift assignment is action, a change in shift assignment based on sex, is actionable under Title VII and not address the other matters that are being asked about by this court today. We can avoid talking about materiality standards. We can avoid talking about de minimis and all of that if the court so chooses by simply deciding this case. But I think that that would be an insufficient way to go about it. At bottom, I believe what this court is faced with doing is deciding whether there is going to be an objective standard or whether there is going to be a subjective standard. And I think that in doing so, one has to take the appellants at their word. In their brief, they make it clear that there is no de minimis standard. I don't think they could have said it any more clearly, nor could the United States have been any more clear when they said that inherent harm is sufficient. They eschew any de minimis standard. And that is at odds with what every court that has taken up this issue has done. Even the Threat Court took care to talk about the inclusion of a de minimis standard. However, the appellants here make it very clear that any discrimination of any kind should be actionable because they say that the stigma attached to differential treatment should itself be actionable. That is unworkable. It has to be unworkable by its nature. It is not judicially administrable. I'll come back to that. But let's go to a hypothetical. It may seem silly, but let's talk about what they're really saying. If an employer, for some reason, when welcoming new employees into the onboarding process, were to say, oh, well, we're giving men two pencils and a pen, part of your packet. Oh, you're a woman. You get one pencil. You don't get a pen because you're a woman. Under the appellant's viewpoint of Title VII, even though the harm here cannot be said to be anything by any objective measure that is actually a harm, unless you want to talk about maybe the cost to the employer of a 50-cent pencil, the stigma attached to that, in their view, would be actionable under Title VII. And a plaintiff, trose, perhaps, or maybe one who actually has an attorney to take that case, could say, my client didn't get two pencils and a pen. It was on the basis of sex, and they admitted that it was so. That's what I plead. Let's start the discovery process. Let's start the whole thing going. There is no barrier. I don't have to tell this court that the reason that these standards that have been adopted under different names by every court, every circuit, some call it adverse employment action, there are many different names, but they all come down to gatekeeping function. That gatekeeping function is essential. Without the gatekeeping function, you have something that is akin to what happened in the world of prisoner lawsuits in the prisons, where Congress actually had to step in and create the Prison Litigation Reform Act because of the cost of dealing with these lawsuits. Again, in this situation, the court could decide simply to issue a ruling that says we reverse the prior holdings that a shift change without more is actionable under Title VII. But let's look then what happens if you decide to go further, and the appellants do want you to go further. They have no answer for what the guardrail is going to be, and interestingly enough, the dissent in chambers even talked about this big problem, this looming. Now, Judge Walker, in the Chambers case, talked about objective material harm, objectively material harm. It's in there. In the Frick case, the court assumed there was a de minimis standard. Didn't go into what that de minimis standard was, didn't define it, but it was built in. Can't be avoided if we're to have something that's justiciable. What I found most interesting is what Judge Henderson wrote, joined by Judge Katzus and Judge Rao in Chambers, and it was pointed out in that, in those dissents, and even in the partial concurrence and dissent, that more jurisprudence would be needed, much more. And as was written in the dissent, to keep today's decision within manageable limits, courts will have to build up either new jurisprudence of what counts as terms or conditions of employment, or a new jurisprudence firmly applying the de minimis canon in this case. Are you open to questions now? I can be, certainly. Well, I'm not trying to interrupt. No, I think it would probably be helpful to the court if I went ahead and answered questions. Well, if you're conceding that the case should be vacated and remanded, why are we arguing this? No, I'm not conceding that. Oh, well, there wasn't clear need for my comment. I'm not. I'm pointing out... I thought you did. Excuse me? Didn't you say that with the shift assignments, these are clearly actionable? No, I'm saying that... I must have misheard you there. Okay. I'm sorry. We all collectively misheard you there because I wrote it down and read it. I literally pulled up your brief and it says affirm. I was surprised. Right. And you haven't talked ultimate employment action at all. So are you abandoning that same question? Not at all. To be clear, I think the court should retain its current rule. I think the court should do so in this case because I think that what we are talking here clearly falls into the de minimis harms. I do not believe that this is the vehicle that the court should use to reverse 25 years of law. I'm saying that the court has a fork in the road. That is perhaps what I said. We wouldn't be here if we didn't know there was a fork. Exactly so. And what's the thing that if you see a fork, take it. All I'm saying is if the court wanted to, the court could decide just this case very narrowly. That's one option. The other fork is to take the wider, more... You're opposed to both prongs of the fork. I'm sorry, sir. I understand you're laying out two prongs and you're saying don't take either of them. I'm saying don't take... You're saying we should affirm instead. Okay, now I understand your point. Exactly so. You're saying, is your point sort of categorical then that the time that you have to work is just never a term or condition because you're getting the same pay at the same job? Is that your theory? That's correct. So let's say I'm an employer who hates a certain class. It can be Christian men, it can be African-American women, whatever, protected class. And so, but I understand your rule. So in order to discourage my hated group from working for me, they will do the same work, the same pay, everything the same, except that they shall show up Saturday night at midnight and work for 40 hours straight. That's probably an FLSA problem. You get my point. It really doesn't matter. No matter how egregious, work from midnight to 8 a.m. That's not actionable. I just want to make sure I understand your theory. That's not actionable in your world. I'm not going to tell you that I think that that would be appropriate. I'm not going to say that. I'm not asking you to bless it as a moral matter. Is that actionable under Title VII or not? No. No. That's not crazy? Because... Is that a crazy theory of Title VII? Well, let me put it this way. It should not be actionable under the rubric that has been presented here. I think where that would go and what should happen... Counselor, which part of it is not actionable? Is it the showing up for work at midnight? Or is it the having to work until working the 40-hour shift, notwithstanding the FLSA possible violations? Well, yes, there is that problem with the FLSA. So which part of it... I apologize for the bad hypothetical. Midnight to 8 a.m. instead of 9 to 5. I think it should not be actionable as discrimination. I think what one would do would be to properly go to the hospital work environment route on something like that. I think that is where such a circumstance would go. But it's a discriminatory work shift. It's a discriminatory assignment. But you say it's not actionable discrimination. Not actionable just as discrimination. What I'm saying is if the circumstances are so onerous, they're so bad that it reaches that severe or the severity... This isn't a harassment case about hospital work environment. It's a disparate treatment case. People are treated disparately based on race or whatever. But a discriminatory race-based shift assignment would not be actionable? Not just to say discrimination. I think, again, we have to reach a certain level of materiality. And that is why I say that we would then look at that as a hospital work environment claim. Can you show that what is being done on the basis of the protective characteristic, whatever that might be, is so severe that it alters the conditions of the employment? Because, again, if you... Explain to me why having to work every midnight, every night, no matter what, or every weekend, no matter what, is not a material term or condition of your employment. Well, the problem is where you're going to draw the line. And the problem is what is the workplace? Because there are workplaces like hospitals and nursing homes and jails, for that matter, that require around-the-clock work. And people are often assigned to various shifts. And in fact, an employer could eliminate, I think, a claim of discrimination by just hiring every nurse and saying, you are going to have to work a shift as I designated. Because every nurse is now going to have to work at an uncallable shift at some time. Because, you know, if there's a hurricane and a whole bunch of natural disaster and a whole bunch of people put in, a whole bunch of shootings, not unknown in New Orleans. And I gather that you said something about, there's an information, maybe in the district court opinion, that this was done for security purposes? Yes, and none of this is in the record because of the procedural posture of the case. The county's Rule 12B6 motion simply took circuit precedent at face value and said this is not actionable. Which is what you're saying now. I'm sorry, sir? Which is what you're arguing now. Correct. Well, what do you say about the fact that some of these ladies were bumped from their seniority when they were required to work weekends? In other words, the policy changed from one based on seniority to one based on sex. Because... Why is negating seniority not a change in a term or condition? Standing alone, one could look at it that way. But as you pointed out yourself, Judge Jones, certain things, such as jails, have other requirements. And in this case, there is another requirement that all shift assignments are subject to the needs of the jail. Well, you could say I'm hiring jail physicians from midnight to eight and not make it sex-based or race-based or anything else. Just say this position is always going to be midnight or this position is always going to be weekends, not based on sex. And that would not be discrimination. But it's a term or condition of employment, is my point. Well, again, in jails, we have other things going on. Just as we brought up the problem of the FSLA making the one extreme hypothetical untenable. In jails, you have other factors, too. You have only certain sexes can do... Well, carve out jails. I'm sorry? Let's carve out jails. Let's talk about jobs where your physical attributes or your sex safety issues don't matter. The garden variety employment. You can have... It is a term or condition that this job for whoever applies is midnight to eight or Saturday through Wednesday or whatever. Just pick a time. You can hire without discriminating against sex or religion or anything else. One could. Why is that a term of employment when you have to show up? The court could decide that that is... Why shouldn't we decide that? I mean, I'm just looking at the words term or condition of employment. Why is it when you must show up for the job, a term or condition of employment? Because as this court's prior jurisprudence has said, some things are just falling into that category that is below the threshold of harm that Title VII is designed to address. Title VII was not designed to be not just a code of conduct for the workplace, but also a code of... A substitute NLRA for people who do not have the protection of the union. And therefore, if there is any such thing as employment at will, an employer should be able to say whether a shift is a condition of employment or a term of employment or not. Is that not sensible? One could. Counsel, this argument that you say... I'm over here. This argument that you say that, well, the jail may have special needs and so it may need particular employees there that are of a certain sex. That can all be argued on remand, can't it? Because the district court did not say, oh, well, there's a legitimate, there's a BFOQ or something of why we need to have this particular staffing that's gender-based. That was not at all the basis. The basis was straight on our ultimate employment decision, wasn't it? Of the district court's determination. That's the only reason that motion dismiss is granted. Yes, that's absolutely correct. So none of those issues have been tried or played out yet. That's again correct. Okay, would this claim go forward and survive a motion dismiss in every single circuit except this one? I don't think so. Which one would not have it go forward? Because there are some circuits who have had this claim and have let it go forward. I'm sorry, the other way around. I think it would go forward. This claim would survive a motion dismiss in every single other circuit in this country, correct? I think that's probably fair to say in light of the more recent rulings, yes. So counsel, it seems to me that although you're not always saying it outright, that the only way you can win this case is our ultimate employment decision principle, right? Yes. Okay, so just drawing your attention to that standard, as I understand it, that phrase was borrowed from a Fourth Circuit case from the early 80s, right? You familiar with that? Okay, ultimate in that case meant an employment decision as in contrast to the committee that decided, right? The claim was the committee was all white. Yes, the court's concern, as I recall, was what's called intermediate or interstitial. Right, right. So ultimate there didn't mean something that was, you know, about being hired or fired or your wages. It just meant the decision as opposed to the process. Isn't that right? I believe that is the origin. Okay, so when we imported that into our case law, didn't we change the meaning of ultimate when we brought it into our case law and it's caused all sorts of confusion, which is why we're here, right? In part, Judge Duncan. Okay, so how can you defend it then? Well, because when this court and others have used similar formulations, whether they call it ultimate employment decision or adverse employment action leading to an ultimate employment decision, this is really, as I see it, a shorthand for building in a de minimis standard and a materiality standard. The parentage might be questionable and you pointed that out. But in the end, I think what the standard, as it's been phrased, boils down to is a way for courts, district courts, to ferret out what is a substantial claim from an insubstantial claim. So would you be content if the court, the majority of this court, en banc court, wrote an opinion that said, look, the ultimate employment test, we made a mistake when we adopted that. We didn't really do a good job on that. But we're going to have a different standard that incorporates a de minimis test. I don't know if happy is the word. Okay, content. I think that the court could do that and be consistent with what other circuits are doing. I would caution, however, that we have to then address what Judge Henderson said in Chambers in the dissent, which is when one does that, what does one replace it with?  And I would say that despite what the appellants say, that there's a self-limiting factor where insubstantial claims won't be brought, I disagree. I think it was Judge Jones who pointed out correctly that there's the attorney's fees which can drive the bus on these cases. There are costs that are preludes to litigation. They're imposed. Title VII has its own design of trying to reconcile claims before it ever gets to court, but those impose costs as well. Do you take the view that even if we had a different standard and it had a de minimis component, that the facts in this case with the shift changes based on agenda wouldn't get over the de minimis threshold? I believe in this case it is a, does not get over the de minimis threshold. Okay, so your argument is even if we were to change the standard and had a de minimis and went back to the panel, the panel should still affirm? Yes. How does that go with what you told me just a second ago, that this claim would survive a motion to dismiss in every single circuit, some of which have a more than de minimis standard? So I don't understand that this is inconsistent. I think it should not, which I believe is what Judge Stewart was asking, but I stick with my original answer. I think in most circuits it would survive. It would go on to trial. I wasn't trying to put words in your mouth. I was just trying to understand a follow-up to what Judge Duncan asked you. I was just trying to understand, and I think the answer you gave is the one you meant, that in this case, you talk about frivolous cases and cases marginal and all that. Here there's a shift change, agenda-based to the weekend process, seniority. I understood your argument to be that even taking these facts, if we had a new standard and de minimis, this case would not get over the de minimis standard. You answered my question and said that's correct, and the panel would affirm just on a different basis. Is that what you said? Yes, sir. And you stand by that? Yes, sir. Okay. Do you recognize, though, that there's a tremendous tension between your two answers? I do. Can you explain it? Because it's baffling for some. I think, my own view is that this case should not survive because of the de minimis rule. I think under the existing law in the other circuits that we've been talking about, it would go forward for further proceedings, whether that be summary judgment or trial or what have you. Just to try to be helpful over here, just to try to be helpful, when you say it shouldn't survive, what that could mean is you have more proceedings on remand and it doesn't survive summary judgment. But I think you're agreeing that in the standard that's dominating all the circuits, it survives most of its best. My question was on this standard, 12B6, not further down the road. You said that on the 12B6, which is where we are in this case, that if we had a new standard de minimis, your answer twice given is that this case would not survive de minimis. Ain't that what you're saying? It may require factual development. It depends. We're at 12B6. I'm just at 12B6. I'm not at summary judgment. We all agree that you could get further down the road, summary judgment, whatever. Case closed, school's out. I'm just having you at the 12B6 standard. And you are just saying, and have said, shift change in this case, 12B6 point in time, would not, should not, does not satisfy a de minimis standard. And that's what you're saying. And it should not. Our problem is how we're going to define de minimis. And that's the catch here, is how are we going to define de minimis? Well, let me get back to a different viewpoint. Do we really need de minimis besides this case? Because it seems to me, stick with me here, if the employer says, I've got two different kinds of employment, I want shifts from Saturday to Thursday, and shifts from Monday to Friday, I will hire, I will only hire women to do the Saturday through Thursday shift. Or, and I won't, and I won't give them the opportunity to work just the Monday through Friday shift. So, isn't that a hiring discrimination decision? This is hypothetical. You will not hire women to work Monday through Friday. You will only hire them to work Saturday through Thursday. Isn't that a discrimination and a term or condition of employment? The court could decide that it is. All right. Why doesn't that, that's essentially what the Dallas County is doing, or Hamilton County is doing. They're saying, if you want to, the only way you're going to work if you're a woman is you agree to work weekends. We're going to fire you if you don't. Now, ultimately, that's a hiring or firing decision, and it fits squarely within the statute. I don't see why we need de minimis or materiality or anything else to fit within the statute. Well, I'm afraid the only way I can, I can answer that is to say that the, the premise is in itself flawed. And I just have to, I just have to. What premise is flawed? There is a, there is a premise in this lawsuit based on the pleadings that Dallas County, Texas decided just because female guards were female that they were going to be discriminated against. And that construct, it's what's in the pleadings. It's all that was pledged. It's all we have in front of us. The problem is, is that it is an incomplete reality. That's the essential problem. And, and I, again, say. Well, it doesn't have, well, it's flawed unless they've got objectives saying it's on the basis of sex. I mean, they've got to allege more to get it, don't they? And we're not here talking about that, apparently. We're not talking about some other aspect of the case. We're simply talking about a shift change under these facts. But the same as they've alleged, only women have to work weekends. And I don't understand how that doesn't fit squarely within Title VII without embellishing anything, de minimis, materiality, ultimate adverse employment. It's a hiring and firing decision. Either they work weekends or they lose their job. And, and again, in candor, this court could decide to take that first fork in the road and simply decide this case. Let me ask, when this policy was promulgated, was there any written explanation provided? I'm not aware that there was a written explanation. I'm going to be brutally frank with you. I don't know, because we have never gotten to the ins and outs of documents. Well, the reason I suggest that is that if there are written documents in connection with something like this and they're alluded to in the pleadings, they can come up on a motion to dismiss. But we obviously don't have that before us. No, the plaintiffs did not allege anything like that. The only thing that they alleged, I believe it's Record 14, was that a sergeant allegedly made a statement that was based on gender or sex. I don't know which term was used. But I do not recall that there was any allegation that there was written documentation on the point. Well, I say again, we're at 12B6, so you take the facts as alleged and the emphasis as true. The county has never taken a position that what's alleged isn't true. Isn't that correct? Well, we had to assume the truth of the facts for the 12B6 motion, obviously. I mean, the policy, you don't say that the policy isn't what it's alleged to be, right? I'm sorry, sir. I'm just not hearing you. You don't take a position that the plaintiffs have erroneously alleged the policy. In other words, the policy is they work weekends, right? They have accurately described the county's policy in the pleadings, is all I'm asking. So insofar as it goes, but it is incomplete. What they have alleged is true only insofar as it goes. What they have not alleged is that the policy decision was driven by other needs of the jail and other state statutes that required a certain number of different genders to deal with the jail population. And just as a thumbnail, some more than 80% of the jail inmates are male. Some massive number, I think it's in the 70s, 70% plus of the jail. That's not in your motion to dismiss. You filed a motion to dismiss that the claims alleged don't satisfy the Fifth Circuit Health and Employment Standard, period. So, I mean, the rest of that's not in the case. Well, I was trying, when the court asked if what was in the pleadings was accurate, that's why I'm saying it's accurate insofar as it went, but it only told part of the story. Counsel, let me ask you, you may be hearing from different people here that ultimate employment decision is wavering or is teetering and may not withstand majority of the court. We'll find out if that's true or not. But it seems to me what you're arguing for may be perfectly correct when you look at different standards. There at least needs to be a significant employment decision in your mind. Ultimate throws it off the analysis, but may be significant or material or not de minimis or something else. But it seems to me if we do say that's the wrong standard, the arguments you're making now are just things to be made at the next stage in the litigation, fully explored justification for what happened and whatever else that you want to present. What, from Dallas's viewpoint, the county's viewpoint, why is that an inappropriate way to proceed? That you go back, we get rid of the word ultimate, and whatever else we come up with you'll have to deal with, and if you want to justify what happened, you justify what happened and see what happens next. Is that a valid way to proceed? Just look, I think it is a valid way to proceed. But again, I would urge the caution that when one does away with the word ultimate and by implication does away with the 20 odd years of case law development in this circuit that uses that, one has to replace it with something. And you're nonetheless, unless you go with the appellant's view, that there is no de standard, that it doesn't exist, then you're going to have to come up with something. And whether you call it materiality, whether you call it, well, use whatever word you want to, you're going to have to decide whether it's going to be an objective harm or whether it's going to be a subjective harm. If you're going to decide that it's objective, and I think the Supreme Court in all of its to craft something of a materiality standard, a de minimis standard, if you will, to address what the dissent in chambers talked about, needing a whole new jurisprudence to define what it is that is above that de minimis. So I think the shorter answer to your question, sir, is I think the court could take the course that you proposed, but sooner or later, you're going to have to define what you mean by your standard, unless you decide there is no standard. Thank you. I see that my time is up. I thank the court for your attention, and I'd ask the court to affirm the decision below. I'd like to start with Judge Eldrod's question about the circuit, setting aside the D.C. between, for example, the Sixth Circuit and the other circuits. And I point the court to the Fourth Circuit case law, because that's what the panel decision raised. And so the Fourth Circuit rejects the ultimate employment decision rule, but applies a height and charm requirement that has led that court to hold that discriminatory conduct with respect to terms, conditions, or privileges of employment is non-actionable. And I'm talking about discrimination that is more, that is non-trivial. So, for example, that court has held that a forced reassignment to a more stressful position, or one that involves less supervisory responsibilities, does not give rise to a Title VII claim. And the same goes for discriminatory scheduling changes and discriminatory discipline, including reprimands and placement on performance review plans, and discriminatory nomination to particular employment awards. Now, the county says that no court has ever held that there's an inherent harm in being discriminated against based on one of Title VII's protected characteristics, or based on a protected characteristic. But that was precisely the whole thing in Brown v. Board of Education, where the question presented was whether race-based discrimination deprived students of equal educational opportunities, even though the physical facilities and other, quote, tangible factors were supposedly equal. And the court answered by saying that discrimination alone generates a feeling of inferiority that affects the hearts and minds in a way unlikely to ever be undone. So, in addition to leaving this court powerless to enjoin the county's women work the weekend policy here, the ultimate employment decision rule has so distorted the meaning of terms, and this circuit is free to require black employees to work outside in the heat with no water, while allowing white employees to work inside with air conditioning. I mean, I'm sorry to interrupt, but I am concerned about saying that this is a term condition of privilege of employment. If we say too much in the opinion, we are in essence granting summary judgment for your client. And I'm wondering, or are we not, is there a way that the defendant can win? I posit a situation where the jail is a very busy place during the week because inmates are not locked up for lengthy terms, as in the state prison, but they have to go in and out. They go to medical appointments. They go to meetings with their doctor. They go to court appointments. So they're being escorted in and out quite a lot during the, they're being escorted into court, probably. And therefore, there is a good reason for having, pardon the characterization, big burly men escorting them rather than a coterie of smaller, less strong women. And so I'm wondering, if that were the case, is there any possible way you can say, based on your interpretation of discrimination, that the employer could prove that this change was not because of sex? The county would have the opportunity to prove that this change in the term conditions or employment was not based on sex, and that would be a reason at the summary judgment stage why the case might be dismissed. But at this stage, the allegations are that there's an across-the-board workplace policy that requires women but not men to work weekends, and that is discrimination. That's the heartland of what Title VII was designed to protect against. So we ask this court to reverse the ultimate employment decision rule and remand. Thank you. The court will take a brief recess.